IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 20-cr-036-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **JORGE DE LA ROSA-CALDERON,**
2. **EMILIO JOSIAH DEHERRERA,**
3. **JANINE JANELLE DEHERRERA**,
4. ALEXZANDER BLAIR, and
5. **WESLEY PAPPAS,**

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS'** *JAMES* **MOTIONS**

---

The Government charges Defendants Jorge De La Rosa-Calderon, Emilio Josiah DeHerrera ("E. DeHerrera"), Janine Janelle DeHerrera ("J. DeHerrera"), and Wesley Pappas as follows:

- Defendant Jorge De La Rosa-Calderon with four counts of possession of a firearm / ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1);

- Defendants De La Rosa-Calderon, E. DeHerrera, J. DeHerrera, and Pappas with one count of conspiracy to distribute and possess with intent to distribute one or more of the following controlled substances: (1) 50 grams and more of methamphetamine; (2) a mixture and substance containing a detectable amount of heroin; and (3) a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), in violation of 21 U.S.C. § 846;

- Defendants De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera with one count of distribution and possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine, in

- violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2;

- Defendants De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera, and Pappas with one count of distribution and possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii), and 18 U.S.C. § 2;

- Defendants De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera with one count of distribution and possession with intent to distribute a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2;

- Defendants De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera with one count of distribution and possession with intent to distribute a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2;

- Defendants De La Rosa-Calderon and E. DeHerrera with two counts and one count, respectively, of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i);

- Defendants De La Rosa-Calderon and Pappas with one count of possession with intent to distribute a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C);

- Defendant De La Rosa-Calderon with one count of illegal re-entry after deportation, in violation of 8 U.S.C. § 1326(a), (b)(1);

- Defendant J. DeHerrera with one count of knowing transfer of a firearm for use in a drug trafficking crime, in violation of 18 U.S.C. 924(h); and

- Defendant Pappas with one count of possession with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).

(ECF No. 38.)

Before the Court are the motions for *James* hearings filed by J. DeHerrera (ECF No. 47), Pappas (ECF No. 81), De La Rosa-Calderon (ECF No. 129), and E. DeHerrera (ECF No. 131). Defendants seek a pretrial "*James* determination," *i.e.*, a ruling on

whether alleged co-conspirator statements satisfy Federal Rule of Evidence 801(d)(2)(E) and may therefore be introduced against them at trial for the truth of the matters asserted.[1]

The alleged co-conspirators in this case are De La Rosa-Calderon, E. DeHerrera, J. DeHerrera, and Pappas.  (*See* ECF No. 94 at 5.)  The Court presumes familiarity with the facts leading to the co-conspirators' arrest on February 5, 2020, as described in the Court's Order Denying Pappas's Motion for a *Franks* Hearing and Order Granting Pappas's Motion to Suppress.  (ECF Nos. 170, 188.)

The undersigned ordered the Government to respond to Defendants' motions with a detailed written proffer of co-conspirator statements it intends to introduce for the truth of the matters asserted.  (*See* ECF Nos. 100, 160.)  The Government submitted a proffer containing 14 statements.  (ECF Nos. 94, 137, 143, 145.)  De La Rosa-Calderon, J. DeHerrera, and Pappas responded in opposition to the admissibility of all 14 statements.[2]  (ECF Nos. 103, 165, 173.)

For the reasons explained below, Defendants' objections are sustained in part and overruled in part.

---

[1] The practice surrounding Rule 801(d)(2)(E) embodies what is commonly referred to as a *James* determination, which gets its name from *United States v. James*, where the Fifth Circuit held that a declaration by one defendant is admissible against other defendants only when there is a "sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy."  590 F.2d 575, 581 (5th Cir. 1979).  The Court at times employs the *James* terminology in this Order, in accordance with common practice.  But, ultimately, admissibility of the co-conspirator statements is governed by Rule 801(d)(2)(E).

[2] Although the Government ordered E. DeHerrera to file a reply on or before October 9, 2020 (*see* ECF No. 160), E. DeHerrera did not file a reply brief and has waived his opposition to the admissibility of the statements.

## I.  NO HEARING NECESSARY

A district court can "only admit co-conspirator statements if it holds a *James* hearing or conditions admission on forthcoming proof of a predicate conspiracy through trial testimony or other evidence." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation marks omitted).  Therefore, although a hearing is not required, the Tenth Circuit has expressed a "strong preference" for pretrial *James* proceedings.  *Id*.  The reason for this preference is that if a court provisionally admits a statement with the caveat that the Government "connect up" the statement to sufficient evidence of a predicate conspiracy at trial, the risk of prejudice to a defendant is high should the Government later fail to meet its burden.  *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994).  Nevertheless, whether to hold a *James* hearing rests within the Court's discretion.  *Id*.

The Court has reviewed the briefing on this issue and determined that a hearing is not necessary to resolve the admissibility of the Government's proposed co-conspirator statements.  The Court therefore decides the matter on the briefing submitted by the parties.

## II.  LEGAL STANDARD

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is "not hearsay" if it "is offered against an opposing party" and it "was made by the party's [co-conspirator] during and in furtherance of the conspiracy."  However, "[b]efore admitting statements into evidence under the [co-conspirator] exception to the hearsay rule, the district court must determine by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and

4

(3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017).

Whether this standard is satisfied is a "preliminary question about whether . . . evidence is admissible," meaning the Court "is not bound by evidence rules, except those on privilege," when resolving the question. Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 178–79 (1987). As the offering party, the Government bears the burden of showing the preliminary facts by a preponderance of the evidence. *United States v. Perez*, 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc).

"The court may consider both independent evidence and the statements themselves when making this finding." *United States v. Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013); *see also Bourjaily,* 483 U.S. at 180 ("[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."). The Tenth Circuit requires "at most that there be some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142; *see also United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) ("most courts require some reliable corroborating evidence apart from the [co-conspirator]'s statements before those statements may be used"). However, the independent evidence "need not be substantial." *Alcorta*, 853 F.3d at 142 (internal quotation marks omitted).

### III.  ANALYSIS

**A.     Existence of a Conspiracy**

To prove that a conspiracy existed the Government must show: (1) two or more persons agreed to violate the law; (2) the defendants knew the essential objectives of

the conspiracy; (3) the defendants knowingly and voluntarily participated in the conspiracy; and (4) the alleged co-conspirators were interdependent. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). "The core of a conspiracy is an agreement to commit an unlawful act." *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991). To prove knowledge of the essential objectives of a conspiracy, the Government does not have to show the alleged co-conspirators knew all the details or all the members of a conspiracy. *Id*. "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged co-conspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (internal quotation marks omitted). A conspiracy may be inferred from circumstantial evidence. *United States. v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986).

The Court will analyze whether: (1) the Government has met its burden in establishing that the existence of conspiracy between De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera; and (2) whether this conspiracy also included Pappas.

    1.    <u>Existence of a Conspiracy Between De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera</u>

Assuming undercover ATF agents testify consistent with the Government's expectation, the Court finds that the Government will demonstrate, by a preponderance of the evidence, the existence of the alleged conspiracy between De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera. In particular, undercover ATF agents are expected to testify to the following:

- They conducted firearms transactions with E. DeHerrera, who introduced the undercover ATF agents to his mother, J. DeHerrera, and her boyfriend, De La Rosa-Calderon. (ECF No. 94 at 8.)

- In October 2019, the undercover ATF agents asked E. DeHerrera whether he had a source for methamphetamine, and E. DeHerrera had informed him that De La Rosa-Calderon could supply "everything." (ECF No. 94-1 at 3 (Statement #2).) De La Rosa-Calderon, in turn, informed the undercover agents that although he was not sure that he could get crystal methamphetamine as requested, they should let E. DeHerrera know what they need. (*Id.* at 4 (Statement #3).)

- On December 4, 2019, De La Rosa-Calderon and an undercover agent conducted a narcotics transaction at the front of a car where J. DeHerrera sat with the windows rolled down. (ECF No. 94 at 9.) During that meeting, De La Rosa-Calderon informed the undercover agent that he could supply pounds of methamphetamine and he and the undercover agent discussed a transaction for a pound of methamphetamine. (*Id.*) De La Rosa-Calderon also informed the undercover agent that he had "blues" that he was willing to sell. (*Id.*)

- On January 3, 2020, De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera met with undercover agents to conduct a firearms and narcotics passenger. (*Id.* at 10.) De La Rosa-Calderon conducted a drug transaction on the hood of the car in front of J. DeHerrera and pulled out two bags containing methamphetamine and an 8-ball of heroin. (*Id.*)

- On 15 occasions between January 7 and February 3, 2020, De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera traveled to Pappas's residence, a suspected stash house, at all hours of the day for short periods of time. (*Id.*) On one trip, De La Rosa-Calderon entered and left Pappas's residence carrying a black bag that was "visually consistent" with the black bag that he used to carry narcotics to his transaction with the undercover agents on January 3, 2020. (*Id.*)

- De La Rosa-Calderon and an undercover agent arranged for a five-pound methamphetamine transaction on February 5, 2020.[3] (*Id.* at 11.) De La Rosa-Calderon E. DeHerrera, and

---

[3] However, De La Rosa-Calderon was not able to obtain the methamphetamine from his source prior to this meeting. (ECF No. 94 at 11.)

J. DeHerrera all attended this meeting.  (*Id.*)

This anticipated testimony is corroborated by: (1) video footage of October 8, 2019, December 4, 2019, and February 5, 2020 meetings between De La Rosa-Calderon, E. DeHerrera, J. DeHerrera and undercover agents; and (2) an audio recording of a January 1, 2020 phone call in which E. DeHerrera and set up a time to meet for a narcotics transaction.  (ECF No. 94-2.)

De La Rosa-Calderon argues that the Government's proffer "fails to show any agreement between [himself] and the other members of the alleged conspiracy."  (ECF No. 173 at 5.)  Likewise, J. DeHerrera argues that the there are no statements attributable to her and that "there is no connection [between] declarant[s] and [her] to the conspiracy."  (ECF No. 165.)

However, the Government does not have to prove an express or formal agreement was made.  *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir.1990) (recognizing that an "agreement may be shown by a concert of action by members who participate with knowledge of the common purpose").  It merely has to show the co-conspirators "tacitly came to a mutual understanding." *Rutland*, 705 F.3d at 1250.

Here, the Government has established facts from which a reasonable factfinder could find by a preponderance of the evidence that De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera entered into a conspiracy in which they agreed to violate the law, knew the essential objectives of the conspiracy, knowingly and voluntarily participated in the conspiracy, and were interdependent.  They jointly attended meetings during which one or more members of the conspiracy sold narcotics to

undercover agents. A knowing and voluntary conspiracy with interdependence between the members can be inferred from the fact that: (1) E. DeHerrera introduced De La Rosa-Calderon and J. DeHerrera to undercover agents and informed the agents that De La Rosa-Calderon could supply "everything"; and (2) De La Rosa-Calderon directed the undercover agents to tell E. DeHerrera what narcotics they were seeking. (ECF No. 94-1 at 3–4.)

Although J. DeHerrera did not speak to undercover agents, she was present with De La Rosa-Calderon and E. DeHerrera at meetings with undercover agents, and she did not object when De La Rosa-Calderon conducted narcotics transactions in her presence. (ECF No. 94-2.) Moreover, the Government has represented that its evidence at trial will demonstrate that on at least 15 occasions between January 7 and February 3, 2020, J. DeHerrera traveled with De La Rosa-Calderon and E. DeHerrera to Pappas's residence, which was later found to contain substantial amounts of narcotics. (ECF No. 94 at 10–12.) Thus, based on reasonable inferences from the facts and circumstances of this case, the Court finds that the Government has established by a preponderance of the evidence that J. DeHerrera was a member of a conspiracy with De La Rosa-Calderon and E. DeHerrera.

    2.    <u>Existence of a Conspiracy Between De La Rosa-Calderon, E. DeHerrera, J. DeHerrera, and Pappas</u>

The Court next turns to the question about whether the Government has established that Pappas was also a member of the conspiracy with De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera.

De La Rosa-Calderon argues that the evidence merely shows that "they were in

the same apartment unit on various occasions." (ECF No. 173 at 5.) According to De La Rosa-Calderon, the fact that the DEA ultimately seized narcotics from Pappas's residence on February 5, 2020 does not change this analysis because "[n]o one becomes a member of a conspiracy merely by associating with conspirators known to be involved in a crime." (*Id.*) Likewise, Pappas argues that "[t]here is simply no evidence in the proffer that shows [him] entering into any conspiratorial agreement." (ECF No. 103 at 3.)

Although there are no statements explicitly identifying Pappas as a member of the conspiracy, a conspiracy including Pappas may nonetheless be inferred circumstantially by a preponderance of the evidence by the acts of the other conspiracy members. Likewise, it may be inferred that Pappas knew the essential objectives of the conspiracy, knowingly and voluntarily participated in the conspiracy, and was an interdependent member of the conspiracy based on the following facts.

First, on January 3, 2020, after conducting a methamphetamine and heroin sale with undercover agents, De La Rosa-Calderon's cell phone showed that he was at Pappas's residence within 45 minutes of the drug deal.[4]  (ECF No. 94 at 10.)

Second, between January 7 and February 3, 2020, De La Rosa-Calderon, E.

---

[4] In the affidavit for a search warrant to search Pappas's residence, the ATF agent represented that "Based on your affiant's training and experience, your affiant believes DE LA ROSA-CALDERON sourced the narcotics from [Pappas's residence].  Your affiant further believes that DE LA ROSA-CALDERON received the narcotics on consignment from [Pappas's residence] and returned to [Pappas's residence] after the [undercover] purchase to drop of the proceeds from the transaction.  This belief is based on DE LA ROSA-CALDERON proceeding to [Pappas's residence] immediately after the January 3, 2020 transaction.  Your affiant's training and experience has shown that . . . stash houses are also commonly used, whether to store a larger cache of firearms/narcotics and/or proceeds.  The behavior exhibited by DE LA ROSA-CALDERON, J. DEHERRERA, and E. DEHERRERA with [Pappas's residence] . . . is indicative that they use this location as a stash house." (ECF No. 80-1 at 13–14, ¶ 15.)

10

DeHerrera, and J. DeHerrera entered Pappas's residence on at least 15 occasions at all hours of the day and for short periods of time. (*Id.*) During one such occasion, De La Rosa-Calderon entered and left Pappas's residents carrying a black bag that "was visually consistent with the black bag he used to carry the narcotics he sold on January 3, 2020." (*Id.*)

Third, De La Rosa-Calderon and an undercover agent arranged for a five-pound methamphetamine transaction to occur on February 5, 2020. (*Id.*) During that conversation, De La Rosa-Calderon indicated that he would have to obtain the methamphetamine if the undercover agent was interested in purchasing it. (*Id.*) Thereafter, pole camera footage showed De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera enter Pappas's residence shortly after midnight and stay for approximately two hours. (*Id.*)

Finally, on February 5, 2020, De La Rosa-Calderon, and E. DeHerrera told undercover agents that they were unable to obbain the five pounds of methampetamine from their source, but that their source—identified as "Englewood"—would obtain the methamphetamine at around 7 p.m. that evening. (*Id.*) During an execution of a search warrant of Pappas's Englewood residence that evening, agents uncovered 375 gross grams of suspected methamphetamine, approximately 72 gross grams of suspected cocaine, approximately 79 gross grams of suspected crack cocaine, and approximately 128 gross grams of suspected fentanyl pills that were "visually consistent with the pills sold" by De La Rosa-Calderon on January 3, 2020. (*Id.*)

Pappas raises the possibility that the "individuals identified are involved in not

one but multiple different conspiratorial groups."[5] (ECF No. 103 at 2.) However, it is not required for every co-conspirator to "know of the . . . full extent of the conspiracy [as long as he has] a general awareness of both the scope and the objective of the enterprise." *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999) (brackets in original); *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979) ("Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know.").

Here, the evidence suggests that Pappas joined a conspiracy that included De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera based on a "common purpose or design," *i.e.*, selling narcotics in Colorado. *See United States v. Evans*, 970 F.2d 663, 669 (10th Cir.1992); *Yehling*, 456 F.3d at 1240. The circumstantial evidence further suggests that Pappas knew the essential objectives of the conspiracy, knowingly and voluntarily participated in the conspiracy, and was interdependent (*i.e.*, by providing narcotics that the other members of the conspiracy sold).

**B.   Statements Made During the Course and In Furtherance of the Conspiracy**

The Court next considers whether the 14 statements identified by the Government "were made in the course of and in furtherance of the conspiracy." *Alcorta*, 853 F.3d at 1137.

1.   During the Course of the Conspiracy

"A [co-conspirator] statement is made 'during the course' of the conspiracy if it is

---

[5] This argument would hold more weight if the declarants were individuals other than De La Rosa-Calderon or E. DeHerrera, and there was no evidence linking Pappas to a conspiracy with the declarants. That is not the case here.

made before the objectives of the conspiracy have either failed or been achieved." *United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995) (internal quotation omitted); *see also Krulewitch v. United States*, 336 U.S. 440, 442-43 (1949) (holding that a declaration made after the conspiracy's "objectives either had failed or had been achieved" was inadmissible because it was not made pursuant to and in furtherance of the conspiracy). Statements made by co-conspirators during the conspiracy are admissible against a defendant who subsequently joins the conspiracy. *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991). However, to avoid improperly broadening the scope of conspiracy prosecutions, the Court "must carefully ascertain the nature and extent of a conspiracy in determining whether acts or statements can properly be viewed as made during its existence." *Perez*, 989 F.2d at 1579.

De La Rosa-Calderon and Pappas contend that because Count Three of the Superseding Indictment charges a conspiracy beginning "[f]rom a time unknown but not later than December 2019," the Court should not admit statements made prior to December 2019.[6] (ECF No. 103 at 2; ECF No. 173 at 4.) However, the preponderance of evidence suggests that a conspiracy including De La Rosa-Calderon, E. DeHerrera, and J. DeHerrera existed at least by October 2019 when these individuals began meeting with undercover agents and selling narcotics. (ECF No. 94 at 8.) Even assuming Pappas was not a member of the conspiracy prior to December 2019, previous statements made by Pappas's co-conspirators are nonetheless admissible

---

[6] The parties provide no case law in support of their argument that statements made prior to the indictment's beginning date for a conspiracy cannot be introduced under Rule 801(d)(2)(E) where, as here, the Government has established by a preponderance of the evidence that the conspiracy began at an earlier date.

13

against Pappas. *See Brown*, 943 F.2d at 1255 ("previous statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy"); *United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987) ("[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed.").

Accordingly, the Court finds that the Government has met its burden in showing that the co-conspirator statements were made during the course of the conspiracy.

*2.* <u>In Furtherance of the Conspiracy</u>

Last, the Court must determine whether each of the proffered statements was made "in furtherance of" the predicate conspiracy. "[T]he in-furtherance requirement . . . embodies the [Rule] drafters' desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence." *Alcorta*, 853 F.3d at 1137 (quoting *Perez*, 989 F.2d at 1578).

"A wide array of statements can fit this requirements." *Alcorta*, 853 F.3d at 1137.

> Examples of statements which may be found to satisfy the "in furtherance" requirement include statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

*Perez*, 989 F.2d at 1578 (internal citation omitted). On the other hand, "statements are

14

not in furtherance of the conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *Id.* at 1578 (internal quotation marks omitted).

The Tenth Circuit calls for "a construction of the 'in furtherance' requirement protective of defendants," and applies this test "narrowly." *Id.* The focus is "on the declarant's intent in making the statement," rather than on the statement's effect. *Id.* However, "[n]o talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy." *Id.* "To the contrary, this determination must be made by examining the context in which the challenged statement was made." *Id.* at 1578–79.

Applying this standard, the Court finds that Statement #1 and Statements #3 through #14 were made "in furtherance" of the conspiracy. Such statements involve transactions to the conspiracy, including negotiations of narcotics sales and explanations regarding the narcotics that members of the conspiracy have or can obtain, and descriptions of members' efforts to obtain narcotics from their sources. *See United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995) (recognizing that "statements of future intent that set transactions to the conspiracy in motion" meet the "in furtherance" requirement); *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993) (recognizing that statements concerning drug transactions were made in furtherance of the conspiracy); *United States v. Beasley*, 2016 WL 3676465, at *5 (D. Kan. July 1, 2016) (recognizing that calls reflecting discussions of the financing for


narcotics purchases, sources of narcotics supplies, and timing of drug transactions were made in furtherance of the conspiracy).

Statement #2 presents a different question. The first and last sentences of Statement #2, which state that De La Rosa-Calderon had "blues" (fentanyl pills) and could obtain other narcotics, were clearly made in furtherance of the conspiracy and should be admitted into evidence under Rule 801(d)(2)(E). However, Statement #2 also includes the following exchange:

> UC1 later asked Emilio, "You said you[r] mom's boyfriend took one of them to Mexico . . . Oh he gave it to his plug, his plug for what? Emilio said, "He owed him like $5,000 for . . . coke and the blues. For some coca."

(ECF No. 94-1 at 2–3.)[7] The Court finds that this portion of Statement #2 does not further the conspiracy. Instead, it constitutes "idle chatter" that is merely a description of past events. *See Rutland*, 705 F.3d at 1252 (recognizing that "mere narrative declarations of past events" are not "in furtherance" of a conspiracy (internal quotation marks omitted)).

Accordingly the Court will sustain the objection to the portion of Statement #2 which purportedly discusses De La Rosa-Calderon taking a weapon to Mexico to repay drug debts and overrules the remaining objections to Statements #1 through #14.

### IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The *James* Motions filed by Defendants De La Rosa-Calderon (ECF No.

---

[7] According to the Government, this exchange suggests that De La Rosa-Calderon had taken an AR-15 rifle to Mexico and had provided it to his source of supply (*i.e.*, his "plug") to pay off drug debts. (ECF No. 94-1 at 2–3.)

        129), E. DeHerrera (ECF No. 131), J. DeHerrera (ECF No. 47), and Pappas (ECF No. 81) are DENIED to the extent Defendants request an evidentiary hearing but GRANTED to the extent they request a pretrial evaluation of the Government's statements proffered under Rule 801(d)(2)(E); and

2.     The specific objections raised by De La Rosa-Calderon, E. DeHerrera, J. DeHerrera, and Pappas are SUSTAINED IN PART and OVERRULED IN PART as described above.

Dated this 13th day of January, 2021.

BY THE COURT:

_____

William J. Martínez
United States District Judge